deed within which to make the record. The grantee under that statute paid his consideration, and took a valid, effectual, and operative deed, not requiring for its validity to "be first recorded," but one which ceased to be "of any force or effect, for the release of any title or claim of the state, unless the same shall have been recorded as aforesaid within one year from the date of the same." The difference in the phraseology used in the two acts with reference to the record shows also the intention of the legislature to make the provision in the act of 1831 complete in itself, without reference to the act of 1830.

The act of 1830 required the conveyance to "be recorded in the records of the state by the secretary." The act of 1831 provided, "which deeds, being first recorded in the office of the secretary of state, shall be effectual for conveying all the right and title of the state," &c. It is well settled, that where the subject of a former statute is embraced in the provisions of a later statute, if the later statute appears to be intended to prescribe the only rules which should govern that subject, the particulars of the old law in which they differ will be regarded as repealed by implication; but the old law is repealed by implication only pro tanto to the extent of the repugnancy. Dexter & L. Plank-Road Co. v. Allen, 16 Barb. 18; Goddard v. Boston, 20 Pick. 410; Daviess v. Fairbairn, 3 How. [44 U. S.] 636; State v. Wilson, 43 N. H. 419; U. S. v. Tynen, 11 Wall. [78 U. S.] 92; New London R. Co. v. Boston & A. R. Co., 102 Mass. 389. The condition in the act of 1831 was fully complied with when the deed to Eastman was recorded, June 28, 1837. After that time the deed was "effectual for conveying all the right and title of the state." The view we have taken of the construction of the act of 1831 establishes the title of Eastman and the tenants claiming under him, and renders it unnecessary to decide whether the act of June 28, 1867, which authorized the governor to sell and dispose of the public lands belonging to the state, would authorize the sale of lands which the state had once conveyed by deed, and for which the state had received full consideration, and where the seisin of the tenants for thirty years and more had been under a delivery of seisin by the agent of the state, it is not a wrongful intrusion on the public lands.

The defendant did not disseise the plaintiff, and there must be judgment for defendant, with costs.

WOODS v. LAWRENCE CO. See Case No. 59.

WOODS v. OCEAN TOW BOAT CO. See Case No. 13,175.

WOODS (RITCHIE v.). See Case No. 11,865.

WOODS (TAYLOR v.). See Case No. 13,809.

WOODS (UNITED STATES v.). See Cases Nos. 16,759 and 16,760.

## Case No. 17,994.

WOODS et al. v. YOUNG et al.

[1 Cranch, C. C. 346.] [1]

Circuit Court, District of Columbia. July Term, 1806. [2]

### CONTINUANCE—ABSENT WITNESS.

The court will not continue a cause for the absence of a witness, who has been summoned, if no attachment has been moved for, if the witness resides within one hundred miles of this place, although he resides out of this district.

[Cited in Park v. Willis, Case No. 10,716; Lewis v. Mandeville, Id. 8,326.]

THE COURT refused a continuance, because the plaintiff had not taken or moved for an attachment against his witness, John Wood, who lived at Port Tobacco, out of the District of Columbia, and within one hundred miles of this place; not having decided yet that an attachment will not lie for a witness who resides out of the district, and within one hundred miles. See Voss v. Luke [Case No. 17,014]; Park v. Willis [Id. 10,716], November term, 1806.

[The judgment of the court was affirmed on appeal to the supreme court. 4 Cranch, 237.]

WOODSIDE (ALLEGHANY FERTILIZER CO. v.). See Case No. 206.

## Case No. 17,995.

WOODSIDE v. BALDWIN.

[4 Cranch, C. C. 174.] [1]

Circuit Court, District of Columbia. May Term, 1831.

### PHYSICIAN'S LICENSE.

A physician, practising in Washington, D. C., without a license from "the Medical Society of the District of Columbia," may maintain an action at law for his services, if, during the time of those services, there was no existing "medical board of examiners of the District of Columbia."

This was an appeal from the judgment of a justice of the peace for the county of Washington in favor of the appellee [Ethan Baldwin] for $48, for the balance of an account for medical attendance and services from March, 1829, to March, 1830. Upon the appeal, one of the parties demanded a trial by jury, who found a verdict for the appellee for the amount claimed, subject to the opinion of the court upon the question whether the appellee had a right to maintain an action for his medical services without having obtained a license, or diploma, as required by the 5th section of the charter of the Medical Society of the District of Columbia, granted by the act of congress of the 16th of February, 1819 (6 Stat. 221), entitled "An act to incorporate the Medical Society

[1] [Reported by Hon. William Cranch, Chief Judge.]
[2] [Affirmed in 4 Cranch (8 U. S.) 237.]

of the District of Columbia." The 3d section of the charter provides: "That it shall and may be lawful for the said Medical Society, or any number of them attending (not less than seven), to elect by ballot five persons, residents of the District, who shall be styled 'the Medical Board of Examiners of the District of Columbia;' whose duty it shall be to grant licenses to such medical and chirurgical gentlemen, as they may, upon a full examination, judge adequate to commence the practice of the medical and chirurgical arts, or as may produce diplomas from some respectable college or society; each person so obtaining a certificate. to pay a sum not exceeding ten dollars, to be fixed on or ascertained by the society." By the 4th section, any three of the examiners shall constitute a board for examining candidates; and any one of the examiners may grant a license to practise until a board can be held. By the 5th section it is "enacted that after the appointment of the aforesaid medical board, no person, not heretofore a practitioner of medicine or surgery within the District of Columbia, shall be allowed to practise within the said District, in either of the said branches, and receive payment for his services, without first having obtained a license, testified as by this law directed, or without the production of a diploma as aforesaid, under the penalty of fifty dollars for each offence, to be recovered from the county court where he may reside, by bill of presentment and indictment, one half for the use of the society, and the other for that of the informer." By the 2d section the officers, namely, president, two vice-presidents, one corresponding secretary, one recording secretary, one treasurer, and one librarian, were to be appointed at the annual meeting in January, forever; but no time was designated for the election of the board of examiners by the society. It was proved or admitted that there had not been any election of the officers of the society for several years, nor any proceedings by the society; and that there was no existing board of examiners during all the time of the appellee's services for the appellant [James D. Woodside].

Mr. Baldwin, for himself, contended, that the 5th section contained no prohibition of practice, and only gave a penalty to the society, which they only could recover by presentment or indictment; that his practice was not a malum in se. even if there had been a board of examiners to whom he could apply for a license. But there was no such board, and consequently he could not have offended against the 5th section of the charter, as it was impossible for him to obtain a license. Nobody has a right to interfere but the society. The act does not forbid any one to practise gratuitously, nor to receive fees without practising. The Maryland statute of 1798. c. 105, §§ 3, 4, 5, and 6, is exactly like the act of congress incorporating the

society; and the Maryland act of 1821, c. 217, shows that plaintiffs could before that act, recover notwithstanding the act of 1798, c. 105. Berry v. Scott, 2 Har. & G. 92, in the year 1827. He contended also, that the society was not in existence. It had become extinct by nonuser. 2 Kent, Comm. 238; Head v. Providence Ins. Co., 2 Cranch [6 U. S.] 127; De Wolf v. Johnson, 10 Wheat. [23 U. S.] 393.

Mr. Coxe, contra. The charter makes the practice and the receiving of payment therefor unlawful, and a contract to pay for such services cannot be maintained. The object of the 5th section of the act was the preservation of the public health; and although the corporation may not exist, yet that section remains in force. 2 Kent, Comm. 245–251. But the corporation has never ceased to exist; and, if it had, the board of examiners would still remain. It is not subject to annual election, as the officers are. But, if the corporation is extinct, the Maryland act of 1798, c. 105, is revived, and the practice is unlawful under that act. The act of 1821, c. 217, only guards against surprise, by the defendant's availing himself of the defence given by the act of 1798. It contains no prohibitory words.

THE COURT (THRUSTON, Circuit Judge absent) affirmed the judgment, with costs.

## Case No. 17,996.

### WOODSON v. FLECK et al.

[Chase, 305; 1　3 Am. Law T. Rep. U. S. Cts. 97; 9 Am. Law Reg. (N. S.) 435; 2 Leg. Gaz. 230; 2 Abb. U. S. 15.]

Circuit Court, D. Virginia.　May, 1870.

De Facto Government—Municipal Authorities—Removal to Federal Courts.

1. The government of Virginia organized at Wheeling. has been recognized by the United States as the rightful government of that state.

2. After all organized resistance to the national authority had ceased in Virginia. that government was established in undisputed exercise of its authority at Richmond. That government was thus established during the year 1865.

3. When the de facto government of Virginia was dispersed by the superior force of the United States, the civil authorities did not necessarily cease at once to exist.

4. They continued in being de facto, charged with the duty of maintaining order until superseded by the regular government.

5. Thus the common council of Harrisonburg. though elected under the de facto government. remained charged with the government of the town, notwithstanding the temporary occupation of the place by the United States forces.

6. It might have been superseded, for the government of the United States was not bound to recognize any authority which originated with the de facto government. But it was not superseded.

7. The mayor and common council, therefore, exercising their authority derived from their

---

1 [Reported by Bradley T. Johnson, Esq., and here reprinted by permission.]